1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

### EASTERN DISTRICT OF CALIFORNIA

9
10

PAMELA RENEE MARTIN,

11
             Plaintiff,

Case No.  1:15-cv-01678-SKO

12
    v.

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

13

CAROLYN W. COLVIN,

14
Acting Commissioner of Social Security,

15
             Defendant.

(Doc. 1)

16
17
_____/
18
19
20

## I.      INTRODUCTION

21
      On November 4, 2015, Plaintiff Pamela Renee Martin ("Plaintiff") filed a complaint

22
under 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of a final decision of the

23
Commissioner of Social Security (the "Commissioner" or "Defendant") denying her

24
applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI).

25
(Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted,

26
without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

27
//

28
_____

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.     BACKGROUND

Plaintiff was born on January 17, 1966, and is currently 50 years old.  (Administrative Record ("AR") 620.)  On January 31, 2012, Plaintiff filed a claim for DIB and SSI payments, alleging she became disabled on March 15, 2009, due to "[s]evere carpal tunnel hands, severe back problems, [and] [high blood pressure]."  (AR 72, 85, 99, 108, 229–33, 253.)  From 2006 to 2010, Plaintiff was a care provider at a residential facility.  (AR 254, 261.)  From 2010 to 2012, Plaintiff was a part-time in-home care provider through the In-Home Supportive Services ("IHSS") Program.  (AR 272, 623.)

### A.     Relevant Medical Evidence[2]

Plaintiff underwent an x-ray of her lower back on April 27, 2010, which showed no fracture, no dislocation, no "significant disc space narrowing," and no "spondylosis."  (AR 353.) From January 11 to 24, 2011, Plaintiff was seen for four physical therapy appointments, after which Plaintiff "noted a slight overall improvement in painful symptoms with [activities of daily living]" and "[i]ncreased active range of motion of trunk and improved posture."  (AR 363–68.)

A MRI of Plaintiff's back was performed on September 27, 2011, which showed a "[l]eft posterolateral disc bulge at L5-S1 compress[ing] the left S1 nerve root within the lateral recess." (AR 354.)  "Lateral disc and facet joint hypertrophy were notable for severe left L5-S1 neural foraminal narrowing and mild right L5-S1 neural foraminal narrowing."  (AR 354.)  The MRI also showed a "L4-L5 broad-based disc bulge caus[ing] mild-to-moderate central spinal stenosis associated with annular tears.  (AR 354.)  "Facet joint hypetrophy resulting in bilateral neural foraminal narrowing" was also shown, as was a "[b]road-based disc bulge at L3-L4 caus[ing] mild central spinal stenosis."  (AR 354–55.)  On November 1, 2011, Plaintiff was prescribed Vicodin (hydrocodone) and referred to neurosurgery for "spinal stenosis" and to plastic surgery for carpal tunnel syndrome.  (AR 396–97.)

On January 23, 2012, Plaintiff saw treating physician Brian H. Claque, M.D., with a complaint of back pain.  (AR 409–13.)  Dr. Clague noted that Plaintiff broke her back in the

---

[2] As Plaintiff's assertion of error is limited to the ALJ's consideration of her alleged pain symptoms, only evidence relevant to these arguments is set forth below.

1990s and "has had pain since . . . [b]ut raised three children and works as in home support

despite back pain." (AR 412.) Plaintiff complained of additional leg pain and numbness in her

toes while walking. (AR 412.) Dr. Clague found that Plaintiff had pain with spinal motion,

limited range of motion, 2+ knee reflexes, and absent ankle reflexes. (AR 412.) Dr. Clague's

assessment of Plaintiff was that she had degenerative lumbar disc with stenosis, and

recommended epidural steroid injections and a corset. (AR 412–13.)

Plaintiff received epidural steroid injections in her back on February 1 and 22, 2012. (AR

411–12, 455–56.) On March 2, 2012, Plaintiff had a follow up appointment with Dr. Clague.

(AR 420–27.) He noted that she "[h]ad been advised for epidurals and [physical therapy]."

Plaintiff stated that her "legs are good, back pain not relieved although brace helps" and that she

wanted to see a surgeon. (AR 423.) Dr. Clague observed that Plaintiff was "better from steroid

but still has back pain" and ordered Vicodin for her pain. (AR 422, 426–27.) On March 9, 2012,

Plaintiff saw surgeon Dr. Jata, who recommended that Plaintiff undergo spinal fusion surgery at

two levels. (AR 429.)

On June 6, 2012, Plaintiff presented at the emergency department with pain in her leg

"secondary to spinal stenosis." (AR 444–49.) Plaintiff reported pinched nerve pain radiating

down her legs, that she had been taking muscle relaxants and prescribed Norco for pain, and that

cortisone shots have helped. (AR 444.) Plaintiff reported she was "getting around with a cane"

and had been wearing a brace for a few months. (AR 444.) Plaintiff stated that she is "waiting

for back surgery" and that she had been "[t]rying to reach the surgical scheduler." (AR 444.)

The emergency room provider, Jennifer Heppner, M.D., observed that Plaintiff is "ambulating

with a cane" and has "[m]uch increase in difficulty when observed." (AR 447.) Dr. Heppner

also noted that Plaintiff was "[h]aving difficulty scheduling surgery for chronic back pain," that

she was "[p]lanning to contact surgical scheduler when she is back in the office," and that

Plaintiff had "[n]o new concerning symptoms." (AR 447.)

On June 21, 2012, consultative examining physician Samuel B. Rush, M.D., evaluated

Plaintiff. (AR 463–67.) He found Plaintiff's flexion, extension, lateral bending, and rotation in

the cervical spine were within normal limits. (AR 465.) Dr. Rush observed "tenderness over the

midline and paraspinal areas of the lower back, and that "no rotation" could be done of her lumbosacral spine. (AR 465.) Plaintiff's straight leg test was "[m]arkedly positive" on the right and "borderline positive" on the left. (AR 465.) Plaintiff also had full (5/5) motor strength in her bilateral upper extremities, slightly reduced strength in her right lower leg (3/5) and left lower leg (4/5), and "good grip in both hands." (AR 466.) Dr. Rush noted that Plaintiff "walks with difficulty in a flexed position of her spine complaining of pain," and that she "had a cane with her, which seemed to help." (AR 466.)

Dr. Rush's impression was that Plaintiff "has marked limitations of her lumbosacral spine and positive straight-leg raising test on the right." (AR 466.) Dr. Rush concluded that Plaintiff's "impairment related physical limitations" are: she is limited to (1) "[p]ushing, pulling, lifting, and carrying" to 20 pounds occasionally and 10 pounds frequently; (2) "[w]alking and standing" two (2) hours per day; (3) needing a cane for support; (4) "bending, kneeling, stooping, crawling, or crouching" occasionally; and (5) "occasional walking on uneven terrain and rarely climbing ladders." (AR 467.) Dr. Rush found no limitations on sitting, working at heights, hearing and seeing, and "[u]se of the hands for fine and gross manipulative movements." (AR 467.)

On August 6, 2012, Plaintiff attended a surgery consult for her "[b]ilateral carpal tunnel syndrome." Joseph Christiansen, M.D., noted that Plaintiff "also has spinal stenosis with spine surgery pending." (AR 480.) On August 15, 2012, Dr. Clague noted that Plaintiff walked without an apparent limp using a cane in her right hand and that she "gets up easily," and on September 28, 2012, Dr. Clague noted that Plaintiff "[s]tands and can stand on toes as well as heels" and is in no acute distress. (AR 490, 601.) Plaintiff received an epidural steroid injection in her back on October 15 and November 5, 2012. (AR 491–92, 611–12.)

On January 3, 2013, Disability Determination Service medical consultant A. Nasrabadi, M.D., reviewed the evidentiary record and found that Plaintiff had the following exertional limitations: she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk "with normal breaks" for a total of two (2) hours; can sit "with normal breaks" for a total of "[a]bout 6 hours in an 8-hour workday"; and can push and/or pull with no limitation. (AR 138–39.) Dr. Nasrabadi noted the following postural limitations: Plaintiff can climb

ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl occasionally. (AR. 139.)  Dr. Nasrabadi found Plaintiff had manipulative limitations in that she had limited fingering on both hands.  (AR 139–40.)  Dr. Nasrabadi noted that "[c]ane [was] needed for support and/or prolonged distance since this is based on subjective reports and not supported by the objective [medical evidence in the record.]"  (AR 139.)

Plaintiff attended physical therapy sessions on January 31, February 15, and March 1, 2013.  (AR 587.)  Physical therapist Stephanie K. Oka, P.T., recommended that Plaintiff "[c]ontinue with home exercise program with emphasis on proper body mechanics with postural correction."  (AR 590–91).  Ms. Oka noted that Plaintiff's treatment goals were met, and Plaintiff "is now able to properly gett [sic] in/out of the bed/chair/car, do the laundry, turn her head to the right, backwards, and forwards."  (AR 591.)  Ms. Oka noted further that Plaintiff "can sleep through the night without neck pain or sleep medication use if she uses a cervical roll, is able to perform all household tasks with increased postural awareness & body mechanics, & perform light lifting of 5 pounds or less."  (AR 591.)  Ms. Oka observed that Plaintiff "is now able to crochet so long as she sits in a proper chair, has her arms supported by pillows, and takes frequent breaks."  (AR 591.)  Plaintiff reported her neck pain decreased from "10/10" at the beginning of treatment to "no complaints of neck pain" by the end.  (AR 591.)

On April 18, 2013, Plaintiff underwent an electrophysiological study that was "suggestive of lumbosacral radiculopathy" with "no coexisting evidence of polyneuropathy or myopathy." (AR 579–86.)  On May 6, 2013, Plaintiff presented to the neurosurgery surgical service with continual pain in her back and legs.  (AR 577.)  She stated that the "pain is getting worse despite having tried [epidural steroid injections]."  (AR 577.)  Plaintiff was observed to have negative straight leg raise test and an antalgic gait with use of a walker.  (AR 577.)

On June 26, 2013, Dr. Clague evaluated Plaintiff and noted that she presented with lower back pain "with radiation to legs":

> Pain radiates on the posterior aspect of thigh down into legs and toes.  Pain is about 10+/10.  Physical activity aggravates pain, nothing relieves pain.  Also c/o sporadic urinary incontinence.  Had injections x5 does not helps [sic].

(AR 569.)  Dr. Clague indicated Plaintiff's records were "[r]eviewed by Dr. Levy" on June 25, 2013, "who felt that lumbar surgery was not indicated for her [symptoms]." (AR 571.)  Dr. Clague renewed Plaintiff's pain medication prescription.  (AR 571.)

On July 16, 2013, Plaintiff was admitted to the hospital with complaints of a swelling hand and passing out on multiple occasions.  (AR 525.)  Plaintiff also complained of "worsening back and leg pain," and on July 17, 2013, an MRI of her back was performed.  (AR 526–27.) The MRI showed "[d]egenerative changes of the lower lumbar spine with facet and ligamentum hypertrophy at L4-L5, bulging of the L4-L5 disc, mild-to-moderate lateral recess stenosis, and mild spinal stenosis." (AR 526.)  The MRI also revealed "[a] 3-mm, left-sided, broad posterior protrusion of L5-S1 directed into the left lateral recess," "[m]oderate left L5-S1 foraminal stenosis," and "[m]ild left L4-L5 foraminal narrowing."  (AR 526.)

Regarding Plaintiff's carpal tunnel syndrome, Plaintiff underwent a right-hand carpal tunnel release surgery on August 21, 2012, after which she was "doing well." (AR 485–88, 490.) Following the surgery, Plaintiff had "fairly good" range of motion and reported that the burning sensation was "much improved" and that it no longer woke her up at night.  (AR 488.)  Plaintiff was "[p]leased with the surgical outcome" and was "[s]till awaiting back surgery." (AR 488.) She was advised that she "may be a candidate" for left carpal tunnel release surgery in the future. (AR 488.)

Plaintiff reported that on October 11, 2012, she "some how [sic] pulled against her carpal tunnel, causing discomfort." (AR 490.)  Norio Takayama, M.D., stated that long term damage was "[u]nlikely." (AR 490.)  Dr. Takayama noted that "[h]as carpal tunnel on left side, but has back problem that may need surgery." (AR 490.)  Dr. Takayama told Plaintiff that she needs to "take care of more serious problem first" and "[w]ait another 4 months before surgery on left hand." (AR 490.)

Plaintiff saw nurse practitioner Jon Anderson, N.P., on July 24, 2013, for "painful triggering of [Plaintiff's] right thumb." (AR 523.)  On August 29, 2013, Plaintiff underwent a right-hand trigger thumb release surgery.  (AR 500, 507–09.).  Post-surgery, Plaintiff had "excellent" range of motion and good control of pain.  (AR 505.)

**B.      Plaintiff's Statement**

On May 4, 2012, Plaintiff completed a "Pain Questionnaire," in which she described her lower back pain and pain in both hands as "undescribable" [sic] and stated that her "pain level is always high" and "constant." (AR 288.) In response to the question "What brings the pain on (Please be very specific)?," Plaintiff responded "sitting, standing, bending, walking, sweeping, mopping, everything from the time I get up til [sic] I sleep and I hurt when I turn over in my sleep." (AR 288.) Plaintiff described her "usual daily activities" as follows: "I still try to walk and shop but it hurts so bad. Unable to do chores now. I need help with everythings [sic]." (AR 289.) She stated that "all activities have stopped" because of pain. (AR 290.) Plaintiff stated that she can walk a "short distance" outside her home, that she can stand 20 minutes and sit 10 minutes at a time, that she uses public transportation to perform errands, and that she needs assistance cooking, cleaning, doing laundry, shopping, getting out of the shower, and sometimes to put on pants. (AR 290.)

**C.      Administrative Proceedings**

Plaintiff filed an application for DIB and SSI on January 31, 2012, alleging she became disabled on March 15, 2009. (AR 72, 85, 99, 108, 229–33, 253.) The agency denied Plaintiff's applications for benefits initially on August 10, 2012, and again on reconsideration on January 18, 2013. (AR 159–63, 171–76.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 181–82.) On January 8, 2014, Plaintiff appeared with counsel and testified before an ALJ. (AR 616–63.)

**1.      Plaintiff's Testimony**

Plaintiff testified she was 47 years old at the time of the hearing. (AR 620–21.) The highest level of education Plaintiff completed was eleventh grade. (AR 622.) Plaintiff said she lived in a triplex with her husband, who is disabled and in a wheelchair due to degenerative disc disease. (AR 620–21, 648.) Plaintiff testified that her husband has a care provider paid for by the county, and that she helps care for him as "best [she] can." (AR 648.)

Plaintiff testified that the "main reason" she stopped working was "back problems." (AR 631.) Plaintiff said she has constant "sharp pain" in her back below her waistline "all the way

across." (AR 631.) Plaintiff testified that "sitting and standing too long" and walking too far make the pain worse. (AR 632.) She first testified that the pain radiated down both of her legs, but later limited the radiating pain to her right leg. (AR 635.) Regarding her right leg, Plaintiff testified that the pain went all the way down to her right foot while walking, and down to her right knee when not moving. (AR 633–35.) With respect to her left leg, she said that she has non-radiating pain in her left knee while sitting. (AR 635.) Plaintiff testified that "sitting and standing too long" and walking too far make the pain worse. (AR 632.)

Plaintiff testified that muscle relaxers and "the Norco painkiller" relieve the pain. (AR 632.) She said that she had five epidural shots that gave her relief for two weeks. (AR 655.) Plaintiff testified that Dr. Clague prescribed her a back brace that she wears all day, other than while sleeping, and that it helps with the pain. (AR 633.) She said that Dr. Clague also prescribed her a cane that she uses every day, both in and outside her home. (AR 636.) Plaintiff testified that she could walk 30 or 40 feet and stand 20 minutes without the cane, and that she could walk "two or three blocks" and stand one hour with the cane. (AR 636–37.) In an eight-hour workday, Plaintiff testified she could only sit one hour, and that she could stand and walk a total of two hours. (AR 637–38.) Plaintiff testified that she's "waiting" on an appointment for back surgery (AR 638–39), but that she can't have that surgery due to a lack of insurance (AR 630). Later, Plaintiff testified that she has Medi-Cal insurance. (AR 638.)

Plaintiff testified that she had surgery on her right hand for carpal tunnel syndrome in August 2012. (AR 639.) She said that, prior to the surgery, her whole arm would "burn severely," she would drop heavy things, she could not open a jar, and that she could not hold a pen and write a letter. (AR 640.) Plaintiff testified that after the surgery, her hand was "much better," that she no longer dropped things, could open a jar, and no longer had burning pain. (AR 641.) She testified that she developed problems with her right thumb about eight months after her carpal tunnel surgery, and she had "right thumb trigger release" surgery on August 29, 2013. (AR 641–42.) Plaintiff said that after that surgery, her right hand is "much better." (AR 643.) She testified that she wears a brace on her left hand, and that she experiences "burning" of her "whole hand." (AR 643.) Plaintiff said that she can't grab items with her left hand and drops

heavy items with that hand.  (AR 644.)  Plaintiff testified that she has a walker as recommended
by her physical therapist, but that she doesn't use it due to burning in her hand.  (AR 654.)

Plaintiff testified that she is able to cook and do laundry.  (AR 649.)  She said she was
taught by her physical therapist how to vacuum without bending, and can vacuum for 10 or 20
minutes.  (AR 649.)  Plaintiff testified that she cleans the bathtub and "gets down on her knees"
to clean the shower bench.  (AR 655.)  She said she likes to read and watch TV, and can follow a
one hour TV show.  (AR 651.)  Plaintiff testified that she "lose[s] herself" watching movies due
to the side effects of her medications.  (AR 651.)  She said she gets three hours of sleep per night
and that the pain wakes her up when she turns over.  (AR 652.)  Plaintiff spends four hours per
day resting.  (AR 652.)  Plaintiff testified that when she worked in the residential care facility, she
cooked, cleaned, helped patients with their medication, and lift and carry laundry.  (AR 624.)

## 2.    Vocational Expert's Testimony

The Vocational Expert ("VE") identified Plaintiff's past work as a home attendant,
Dictionary of Operational Titles (DOT) code 354.377-014, which was medium exertional work
with a specific vocational preparation (SVP)[3] of 3, and as a practical nurse, DOT code 354.374-
010, which was at a medium exertion level with a SVP of 4.  (AR 657.)  The ALJ asked the VE
to consider a person of Plaintiff's age, education, and with her past jobs.  The VE was also to
assume this person is limited to performing work at the light exertional level, but cannot climb
ladders, ropes, and scaffolds; can perform other postural maneuvers such as stooping, crouching,
and crawling on an occasional basis; can frequently handle and finger with the bilateral upper
extremity; but must avoid concentrated exposure to hazards such as unprotected heights and
moving machinery and pulmonary irritants such as dust, fumes, and gases.  (AR 657–58.)  The
VE testified that such a person could not perform Plaintiff's past relevant work, but could
perform other work as an office helper, DOT code 239.567-010, light exertion level and SVP 2;
information clerk, DOT code 237.367-018, light exertion level and SVP 2; and parking attendant,

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical
worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a
specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).
Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the
highest level – over 10 years of preparation).  *Id.*

DOT code 915.473-010, light exertion level and SVP 2.  (AR 658.)

The ALJ asked a follow up question regarding the first hypothetical worker who was also limited to standing and walking only two hours and would need a cane to ambulate or stand.  The VE testified that such a person could perform work as an information clerk, DOT code 237.367-046, sedentary exertion level and SVP 2; order clerk, DOT code 209.567-014, sedentary exertion level and SVP 2; and assembly worker, DOT code 726.684-110, sedentary exertion level and SVP 2.  (AR 659.)  When asked by the ALJ if the same person had to use a walker instead of a cane, the VE testified that there would be no work such person could perform.  (AR 659.)

**D.      The ALJ's Decision**

In a decision dated March 24, 2014, the ALJ found that Plaintiff was not disabled.  (AR 14–26.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 19–26.)  The ALJ decided that Plaintiff has not engaged in substantial gainful activity since March 15, 2009, the alleged onset date (step 1).  (AR 19.)  The ALJ found that Plaintiff had the severe impairments of (1) degenerative disc disease, (2) bilateral carpal tunnel syndrome, (3) right trigger thumb, (4) hypertension, and (5) asthma (step 2).  (AR 19–20.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3). (AR 20–21.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[4]

> to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except she can stand and/or walk 2 hours using a cane in an 8-hour workday.  She cannot climb ladders, ropes, or scaffolds.  She can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. She can frequently handle or finger with the bilateral upper extremities. She must avoid concentrated exposure to hazards in the workplace and pulmonary irritants.

(AR 21–22.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1   The ALJ determined that, given her RFC, Plaintiff was unable to perform any past

2   relevant work (step 4), but that Plaintiff was not disabled because she could perform a significant

3   number of other jobs in the local and national economies, specifically office helper, information

4   clerk, and parking attendant (step 5).  (AR 24–25.)  In reaching her conclusions, the ALJ also

5   determined that Plaintiff's subjective complaints were not fully credible.  (AR 21, 24.)

6   **E.      The Appeals Council's Decision**

7        Plaintiff sought review of the ALJ's decision before the Appeals Council (AR 10–11),

8   which was granted (AR 222–26.).   On September 9, 2015, the Appeals Council issued its

9   decision adopting the ALJ's findings under steps 1, 2, 3, and 4 of the sequential evaluation,

10  including the ALJ's conclusions regarding Plaintiff's subjective complaints, but disagreed with

11  the ALJ's finding at step 5 that, based on Plaintiff's RFC and vocational factors, she could

12  perform the requirements of representative occupations such as office helper, information clerk,

13  and parking attendant.  (AR 4–5.)  Specifically, the Appeals Council found that

14       An audit of the hearing reveals that these jobs are not consistent with
         [Plaintiff's] residual functional capacity; instead, these jobs were based on
15       a hypothetical that did not include the additional limitation that "[Plaintiff]
16       can stand and/or walk 2 hours using a cane in an 8-hour workday."

17  (AR 5.)  Because "an audit of the hearing testimony revealed that the Administrative Law Judge

18  included this additional limitation in a second hypothetical question posed to the vocational

19  expert," the Appeals Council relied on testimony by the VE

20       to find that [Plaintiff] can perform the requirements of representative
         occupations such as information clerk, DOT 237.367-046; order clerk,
21       DPT 209.567-014; and assembly, DOT 726.684-110.

22

23  (AR 5.)  The Appeals Council therefore concluded that Plaintiff was not entitled to or eligible for

24  DIB or SSI.  (AR 6–7.)

25                        **III.      SCOPE OF REVIEW**

26       The ALJ's decision denying benefits "will be disturbed only if that decision is not

27  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

28  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

1  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

2  Instead, the Court must determine whether the Commissioner applied the proper legal standards

3  and whether substantial evidence exists in the record to support the Commissioner's findings.

4  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a

5  mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198

6  (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind

7  might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

8  (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court

9  "must consider the entire record as a whole, weighing both the evidence that supports and the

10  evidence that detracts from the Commissioner's conclusion, and may not affirm simply by

11  isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028,

12  1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

13                              **IV.        APPLICABLE LAW**

14        An individual is considered disabled for purposes of disability benefits if he or she is

15  unable to engage in any substantial, gainful activity by reason of any medically determinable

16  physical or mental impairment that can be expected to result in death or that has lasted, or can be

17  expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

18  §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The

19  impairment or impairments must result from anatomical, physiological, or psychological

20  abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

21  techniques and must be of such severity that the claimant is not only unable to do her previous

22  work, but cannot, considering her age, education, and work experience, engage in any other kind

23  of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)–(3),

24  1382c(a)(3)(B), (D).

25        The regulations provide that the ALJ must undertake a specific five-step sequential

26  analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

27  whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§

28  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

1  claimant has a severe impairment or a combination of impairments significantly limiting her from

2  performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the

3  ALJ must determine whether the claimant has a severe impairment or combination of

4  impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

5  C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the

6  ALJ must determine whether the claimant has sufficient residual functional capacity despite the

7  impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If

8  not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform

9  other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g),

10 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there

11 is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir.

12 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.      DISCUSSION

14     Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for

15 discounting Plaintiff's testimony regarding her subjective complaints.  (Doc. 16.)    The

16 Commissioner responds that the ALJ properly relied on evidence in the record that undermined

17 the credibility of Plaintiff's allegations of disabling symptoms and limitations.  (Doc. 19.)

18 **A.      The ALJ's Consideration of Plaintiff's Testimony**

19     **1.      Legal Standard**

20     In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

21 must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

22 First, the ALJ must determine whether the claimant has presented objective medical evidence of

23 an underlying impairment that could reasonably be expected to produce the pain or other

24 symptoms alleged.  *Id.*   The claimant is not required to show that her impairment "could

25 reasonably be expected to cause the severity of the symptom she has alleged; she need only

26 show that it could reasonably have caused some degree of the symptom."   *Id.* (quoting

27 *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of

28 malingering, the ALJ can only reject the claimant's testimony about the severity of the

symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the

Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation

marks omitted); *see also Bray,* 554 F.3d at 1226–27; 20 C.F.R. § 404.1529.  Other factors the

ALJ may consider include a claimant's work record and testimony from physicians and third

parties concerning the nature, severity, and effect of the symptoms of which he complains.

*Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the

most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015

(9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.

2002)).  General findings are not sufficient to satisfy this standard; the ALJ "'must identify what

testimony is not credible and what evidence undermines the claimant's complaints.'"  *Burrell v.

Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th

Cir. 1995).

## 2.    The ALJ Properly Found Plaintiff Less Than Fully Credible[5]

Here, the ALJ found Plaintiff's credibility was undermined by several factors:

> The undersigned considered the entire medical record and [Plaintiff's] subjective complaints throughout.  The evidence supports [Plaintiff's] complaints, but not to the extent alleged.  Indeed, the evidence showed improvement with conservative treatment and the ability to perform household chores, care for her disabled husband, sleep through the night, prepare meals, vacuum, read, watch television, and obtain pain relief as needed.  The medical opinions indicate [Plaintiff] is not precluded from all light work activity, but could perform a range of light work on

---

[5]  The Appeals Council "considered [Plaintiff's] statements concerning the subjective complaints . . . and adopts the [ALJ's] conclusions in that regard," finding that Plaintiff's "subjective complaints are not fully credible for the reasons identified in the body of the [ALJ] decision."  (AR 5–6.)  Thus, the Court refers only to ALJ's opinion in addressing the credibility evaluation.

a sustained basis.  [Plaintiff's] testimony was not entirely credible as she alleged significantly greater physical limitation than those found by objective examinations.   Thus, the undersigned found [Plaintiff's] testimony was not entirely persuasive or consistent with the objective record.

(AR 24.)  In sum, in assessing Plaintiff's credibility, the ALJ relied on evidence of improvement of Plaintiff's symptoms with conservative treatment and inconsistencies between Plaintiff's symptoms and the record, including her reports of activities of daily living and the objective medical evidence.

### a.      Conservative Treatment

The ALJ's credibility assessment properly relied on evidence showing improvement in Plaintiff's back pain symptoms with "conservative treatment."  (AR 24.)[6]  Plaintiff attended four physical therapy sessions between in 2011, after which she noted "slight overall improvement in painful symptoms with" activities of daily living, "increased active range of motion in her trunk and improved posture." (AR 22, 363–38.)  In 2013, Plaintiff attended three physical therapy sessions.  (AR 587.)  Physical therapist Ms. Oka noted that, after these sessions, Plaintiff "could sleep through the night without neck pain or sleep medication if she uses a cervical roll" and "is able to perform all household tasks with increased postural awareness and proper body mechanics." (AR 23, 591.)  As a result of these sessions, Plaintiff's neck pain decreased from "10/10" to "no complaints of neck pain." (AR 23, 591.)

Dr. Clague prescribed Plaintiff a back corset to wear, which Plaintiff said helped with pain, and a cane.  (AR 22, 289, 633, 636.)  Consultative examining physician Dr. Rush observed

---

[6] The Court's "conservative treatment" discussion is confined to Plaintiff's subjective complaints of pain in her back and left hand, since Plaintiff underwent two (2) surgeries for carpal tunnel syndrome in her right hand and it is well-established that surgery is not a "conservative" treatment.  *See Contreras v. Colvin*, No. 1:13-CV-01237-JLT, 2015 WL 859626, at *11 (E.D. Cal. Feb. 27, 2015) ("[S[urgery is not considered conservative treatment.") (citing *Ritchotte v. Astrue*, 281 Fed. Appx. 757, 759 (9th Cir. 2008) (rejecting the ALJ's conclusion that the claimant's treatment was too conservative where he had surgery and the prognosis was guarded)); *see also Sanchez v. Colvin*, 2013 U.S. Dist. LEXIS 47081, at *10 (C.D. Cal. Mar. 29, 2013) ("surgery and conservative measures are at different ends of the treatment spectrum").  Following Plaintiff's surgeries on her right hand, the record shows that Plaintiff had "excellent" range of motion, good control of pain, much improvement with the burning sensation – so much so that it no longer woke her up at night – and was "[p]leased with the surgical outcome." (AR 488, 505, 641.)

Regarding Plaintiff's left hand, Plaintiff testified that she wears a brace on her wrist (AR 643), which is considered "conservative treatment."  *See, e.g., Miller v. Comm'r Soc. Sec. Admin.*, No. 3:15-CV-02132-MA, 2016 WL 6868154, at *5 (D. Or. Nov. 21, 2016).  Although the record shows Plaintiff was advised that she "may be a candidate" for surgery, there is no indication that such surgery was ever scheduled.  (AR 488.)  As set forth more fully herein, the fact that surgery was proposed does not undermine the ALJ's adverse credibility determination based on the receipt of more conservative treatment.  *See infra.*

1   that the cane "seemed to help" Plaintiff walk (AR 466), and treating physician Dr. Clague noted

2   that Plaintiff walked without an apparent limp using the cane (AR 23, 490, 601).  The ALJ was

3   entitled to discount Plaintiff's credibility based on her positive response to this conservative

4   treatment.  *See Tommasetti,* 533 F.3d at 1040 (holding that the ALJ properly considered the

5   plaintiff's use of "conservative treatment including physical therapy and the use of anti-

6   inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral

7   corset"); *Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative

8   treatment is sufficient to discount a claimant's testimony regarding severity of an impairment);

9   *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ's adverse

10  credibility determination properly accounted for physician's report of improvement with use of

11  medication); *Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ may properly rely on

12  the fact that only conservative treatment has been prescribed); *Odle v. Heckler*, 707 F.2d 439,

13  440 (9th Cir. 1983) (ALJ may consider whether treatment produced fair response or control of

14  pain that was satisfactory).

15         Although Plaintiff was initially recommended to undergo spinal fusion surgery (AR 22,

16  429), the surgery was never actually performed, and Dr. Levy thereafter reviewed Plaintiff's

17  medical records and determined that lumbar surgery "was not indicated for her [symptoms],"

18  and instead renewed her prescription for narcotic pain medication.  (AR 23, 571.)  Nurse

19  practitioner Mr. Anderson noted, during an appointment following her hand surgery, that

20  Plaintiff "*may* be [a] candidate for steroid injection or surgery if conservative measures fail to

21  improve the symptoms."  (AR 523) (emphasis added).  The fact that back surgery was initially

22  proposed, and then rejected, as treatment does not render the ALJ's adverse credibility finding

23  improper.[7]  *See, e.g., Rodriguez v. Colvin,* No. 2:15–cv–0231-CKD, 2016 WL 258341, at *10

24  (E.D. Cal. Jan. 21, 2016) (finding that the ALJ "properly determined that the relatively

25  _____

26  [7] While there is a note in the medical record that Plaintiff's spine surgery was "pending" (AR 488), elsewhere in the
    record it is indicated that Plaintiff was "waiting" for surgery and having difficulty scheduling it (AR 444, 447).

27  Plaintiff indicated in her "Pain Questionnaire" that the surgery was scheduled for May 2, 2012, but was "cancelled
    due to surgeon shortage."  (AR 289.)  Plaintiff's testimony at the hearing is inconsistent on this point: she testified

28  that she was "waiting" on an appointment for back surgery at the time of the hearing (AR 638–39), but that she
    cannot have such surgery due to a lack of insurance (AR 630).  Plaintiff testified later during the hearing that she has
    Medi-Cal insurance.  (AR 638.)

1   conservative treatment plaintiff received for her allegedly disabling impairments undermined

2   her credibility," where the record demonstrated that while surgery was recommended, she did

3   not follow through with that recommended treatment); *Davis v. Colvin*, No. 1:14–cv–930 AWI–

4   BAM, 2015 WL 5255353, at *11 (E.D. Cal. Sept. 9, 2015) (affirming ALJ's conservative

5   treatment finding where the record showed that surgery had been suggested as an "option" but

6   was not believed likely to be helpful); *Arthur v. Astrue*, No. 1:11–cv–0134 AWI–BAM, 2012

7   WL 4052016, at *7 (E.D. Cal. Sept. 14, 2012) (upholding the ALJ's finding that Plaintiff's

8   symptoms "responded well to conservative treatment" where the surgeon "did not recommend

9   surgery, but instead stated that Plaintiff should 'decide if his symptoms are bad enough and

10  wants to proceed with outpatient surgery.'").

11        The record shows that Plaintiff was prescribed Vicodin and Norco, which relieved the

12  pain[8], and received five (5) epidural steroid injections.  (AR 22, 288, 396–97, 411–12, 423,

13  426–27, 444, 455–56, 491–92, 571, 611–12, 632, 655.)  Plaintiff contends that her receipt of

14  prescription pain medication and epidural injections demonstrates that she did not undergo

15  "conservative" treatment for her back pain.  (Doc. 16 at 11:10–24.)  While Plaintiff is correct

16  that epidural injections, by themselves, have been found not to constitute conservative

17  treatment, *see Hydat Yang v. Colvin*, No. CV 14–2138-PLA, 2015 WL 248056, at *6 (C.D. Cal.

18  Jan. 20, 2015), courts have frequently found that the fact that Plaintiff has been prescribed

19  narcotic medication or received injections does not negate the reasonableness of the ALJ's

20  finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in

21  addition to other, less invasive treatment methods.  *See Huizar v. Comm'r,* 428 Fed. Appx. 678,

22  680 (9th Cir. 2011) (finding that plaintiff responded favorably to conservative treatment, which

23  included "the use of narcotic/opiate pain medications"); *Zaldana v. Colvin*, No. CV 13–7820

24  RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (finding that evidence of treatment

25  including Tramadol, ibuprofen, and "multiple steroid injections" was "a legally sufficient

26  reason on which the ALJ could properly rely in support of his adverse credibility determination

27

28  [8] Impairments that can be controlled effectively with medication are not considered disabling.  *Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006).

because the record reflects that plaintiff was treated on the whole with conservative care for her foot pain with good results and improvement."); *Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment.); *Jones v. Comm'r of Soc. Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility); *Higinio v. Colvin*, No. EDCV 12–1820 AJW, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014) (holding that despite the fact that the claimant had been prescribed narcotic pain medication at various times, the claimant's overall treatment — which also included use of a back brace and a heating pad — was conservative); *Walter v. Astrue*, No. EDCV 09–1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection).

Even assuming narcotic medication and epidural injections and are not simply further conservative treatment for Plaintiff's back pain, however, remand is not required because the remainder of the ALJ's credibility findings were supported by ample evidence in the record, *see infra*. *See Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm. of Soc. Sec. Admin*., 359 F. 3d 1190, 1197 (9th Cir. 2004)) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal."); *Tonapetyan v. Halter,* 242 F. 3d 1144, 1148 (9th Cir. 2001) (that some reasons for discrediting claimant's testimony should be properly discounted does not render an ALJ's determination invalid so long as that determination is supported by other, substantial evidence). This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable

to Plaintiff.  *See Tommasetti*, 533 F.3d at 1039.  Remand is therefore not warranted on this basis.

### b.      Activities of Daily Living

The ALJ also appropriately considered Plaintiff's activities of daily living in determining that she was not entirely credible.  "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . . . Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (citations and quotation marks omitted); *see also Stubbs–Danielson v. Astrue,* 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (ALJ properly considered claimant's ability to care for her own needs, cook, clean, shop, interact with her nephew and boyfriend, and manage her finances and those of her nephew in the credibility analysis); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility).  In *Stubbs–Danielson*, for example, the court found that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband in managing finances.  539 F.3d at 1175.  These activities tended to suggest that the claimant may have still been capable of performing the basic demands of unskilled work on a sustained basis.  *Id.*

Here, the record shows that Plaintiff lives with and cares for her disabled husband "as best [she] can."[9]  (AR 648.)  Plaintiff also reported that she is able to perform household chores such as cooking, doing laundry, vacuuming (without bending, as taught by her physical therapist), and cleaning the bathtub and shower bench (the latter by getting down on her knees).

---

[9] Plaintiff's husband also has a care provider paid for by the County who Plaintiff testified "doesn't have that much . . . hours" and does not care for Plaintiff's husband on the weekends.  (AR 647, 654.)

(AR 591, 649, 655.)   The record indicates further that Plaintiff runs errands using public transportation, and, following physical therapy in 2013, was able to sleep through the night without neck pain or sleep medication with the use of a cervical roll.  (AR 290, 591.)  The record also shows that Plaintiff engages in hobbies such as reading, watching television, and crocheting.  (AR 591, 651.)  The ALJ appropriately considered this evidence of Plaintiff's daily living activities, which is comparable to the activities in the cases cited above and many of which came from Plaintiff's own testimony, to provide substantial support for the ALJ's finding that Plaintiff's statements regarding her claimed inability to work were not entirely consistent. Plaintiff's activities of daily living were, therefore, clear and convincing evidence to discount her credibility.

To be sure, the record also contains some contrary evidence, such as Plaintiff's statements regarding her inability to sleep comfortably, even after physical therapy in 2013 (AR 577), and that she needs assistance to perform some household chores, suggesting that Plaintiff's activities are more limited than they would initially appear.   (AR 290, 577.) However, it is the function of the ALJ to resolve any ambiguities, and the court finds the ALJ's assessment to be reasonable and supported by substantial evidence.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### c.     Objective Medical Evidence

The ALJ properly discounted Plaintiff's credibility due to inconsistencies between Plaintiff's subjective complaints and the medical evidence, specifically "objective examinations" indicating Plaintiff "could perform a range of light work on a sustained basis." *Regennitter v. Commissioner*, 166 F.3d 1294, 1297 (9th Cir. 1998) (explaining that a determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement).  In her "Pain Questionnaire" and her testimony at the hearing, Plaintiff claimed that she had lower back pain radiating down her right leg (21, AR

288–89, 631, 635) and pain in both hands (AR 21, 288, 643), and that she had trouble walking (AR 289) and could only sit one hour and stand hours in an eight hour period (AR 637–38). However, Dr. Rush, consultative examiner, made contradictory findings.  Dr. Rush found that Plaintiff could push, pull, lift, and carry 20 pounds occasionally and 10 pounds frequently and had no limitations on sitting.  (AR 23, 467.)  Treating physician Dr. Clague noted that Plaintiff walked without an apparent limp using a cane in her right hand, that she "gets up easily," and could stand on her toes as well as her heels.  (AR 22, 490, 601.)  Finally, in contrast to Plaintiff's claims, emergency room provider Dr. Heppner noted that Plaintiff was "ambulating with a cane" "[m]uch increase in difficulty [in ambulating] when observed."  (AR 22, 447.)  As the ALJ noted in his decision, Plaintiff's testimony "was not entirely credible as she alleged significantly greater physical limitation than those found by objective examinations."[10]  (AR 24.)

        While subjective symptom testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining Plaintiff's credibility.  *Rollins*, 261 F.3d at 957 (citing 20 CFR § 404.1529(c)(2)).  Here, Plaintiff's subjective complaints were not rejected *solely* on the ground that they were inconsistent with the objective medical evidence: the ALJ also relied on evidence of Plaintiff's activities of daily living and evidence of her improvement with conservative treatment as independent reasons to discredit Plaintiff.  The inconsistencies between Plaintiff's complaints of severe pain and clinical observations, taken together with evidence of Plaintiff's improvement with conservative treatment and her inconsistent statements relating to her inability to work, constitute substantial evidence supporting the ALJ's adverse credibility finding.  *See Morgan*, 169 F.3d at 600 (ALJ may properly rely on plaintiff's daily activities, and on conflict between claimant's testimony of subjective complaints and objective medical evidence in the record); *Rodriguez*, 2016 WL 258341, at *10; *Vellanoweth v. Astrue*, No. CV 10-3105-MLG, 2010 WL 5094254, at *3 (C.D. Cal. Dec. 6, 2010).

---

[10] Plaintiff does not challenge the credibility of these – or any – physicians' opinions.

## VI.    CONCLUSION AND ORDER

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision, as adopted and modified by the Appeals Council, is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:    **February 14, 2017**                    /s/ *Sheila K. Oberto*
                                                    UNITED STATES MAGISTRATE JUDGE